The first case for argument this morning is 22-1898, Return Mail, v. United States. Mr. Fabricant, I'm going to be your witness. Good morning, Your Honors. May it please the Court. We're here on a motion for summary judgment which was granted by the Court of Claims with respect to the issue of patent matter subject patentability under 101. And that's the only issue on this appeal. The Court's obviously familiar with the fact that this case has been to this Court previously, went up to the United States Supreme Court on the issue of whether the government was a person that could institute a CBM proceeding. The case was reversed and vacated in order of vacating the prior decision of the Federal Circuit, and the case was remanded to the Court of Claims where it began anew, where there was discovery, and then ultimately the government brought a motion for summary judgment. We believe that the Court erred in granting the motion for summary judgment because we believe there were clearly factual issues remaining with respect under Burkheim to the very important factually intensive issues concerning specifically routine, conventional, well-known and understood. Step one of Alice is a question of law, correct? It is a question of law, but I do believe, Your Honor, that there are factual issues which relate to step one. For example, I want to address step one first. Claims 42 and 44, which are the two claims at issue, are directed to a specific improvement in return mail processing technology. Now, if in fact they're directed not to the process of returning mail information is abstract. No one disputes that that process is abstract. But this was an innovative and specific improvement and an application on how to do it in a way that had never been done before. And we think that is a factual issue underlying the question of law. Was there — What is that thing that was never done before that is included in the claim? Yes, Your Honor. What was never done before are the steps of the claims, the elements. There had never been decoding of information on the mail item. And I'm not even getting into, Your Honor, what type of decoder or what kind of scanner. I'm talking about the steps of the claim itself. There had never been mail which was decoded and then sent for delivery. But you didn't invent decoding? No, Your Honor. Okay. Encoding and decoding had never been used in the process of providing return mail information. You're not the first one to put a barcode on a letter, right? Letter envelope. I believe we are the first one to put a barcode on a letter whose sole purpose was to provide returned mail information, the process of how you handle returned mail. And I think it's very important to understand, Your Honors, that in the prior arc, in what was known, mail was all sent out for delivery. And there was a process by which the Postal Service would research to see whether before that mail was delivered, and we're talking about all the mail, whether before it was delivered, whether it should be diverted and not even attempted to be delivered. And that was a huge, very, very intensive process, looking at all mail to see whether there was a mail forward that had been submitted to the Post Office or other reasons why the mail couldn't be delivered. What this invention, Claims 42 and 44 of this patent do, is all of the mail is sent out for delivery. All of it is, none of it is researched by the Postal Service. Only when the delivery fails, only when the delivery fails, which is a small subset of the universe of mail, are those failed items then brought to a facility and decoded to see what is to happen. What did the sender want to happen? So this is not a, it's really not a question for step one of what kind of barcode encoder, what kind of decoder. It's the elements of this claim themselves, which created a process, by the way, which has been adopted by the United States Postal System as the most successful system for how return mail is handled. Return mail is an operating business. It's been operating for over 20 years. This is a business which they operate in competition with the United States Postal Service, who we believe is infringing the claims of the patent. And so on step one, we believe there are factual issues. In fact... Just so I understand, when you scan the barcode, there will be information there, and it could tell you that the sender, if there's an updated mailing address, whether the sender wants the updated mailing address. Is that right? That's one of the types of answers. The sender might want the updated mailing address. The sender might not want the updated mailing address. I guess what I'm wondering is, if instead of a barcode printed on the envelope, what if it was just printing something else, some other signal? Like a smiling face. And the smiling face tells you, okay, this sender wants updated mailing information if it turns out that this particular piece of mail is undeliverable. And I think, Your Honor, it's directed exactly on the issue, the factual issue here. I agree that if the mail item had something simple... And so it's nothing more than just communicating some kind of information there, whether it's a barcode or some other indicia, like a smiling face, and that one would decode because you would understand. You would translate the smiling face to, all right, this person, if this mail is undeliverable, would like an updated address for the recipient. Again, that kind of an invention, would that be patent eligible? Because now I've stripped out any need for a scanner or a database or anything like that. I think there's a step one question and a step two question, both contained in what you asked. I think for step one... What I'm asking is, is a non-computer implemented version of this method of updating mailing addresses patent eligible? I think if there were absolutely nothing which was part of this invention other than what a human could put on that and what a human could read with their own eyes without having to decode something which is data and something a human mind is not capable of performing, then I don't think there would be a specific improvement of the abstract concept. You didn't invent decoding. So are you suggesting that as a matter of law or fact that decoding somehow because it's an electronic term makes the difference between eligibility and ineligibility? Because I recall we got a lot of cases in 101 that involve electronic stuff, and that hasn't been the way to save a claim from ineligibility. I think it matters what the decoding is being done for. In some applications that are unrelated to return mail, it may very well be just part of an abstract idea or concept. But here the entire, taken as a whole, Claim 42, the elements of the claim lay out a procedure, a process, a method that had never been done before. But we agreed just a few minutes ago that a human-implemented version of this claim method would not be patent eligible. It would just be an abstract idea of a process of updating mailing address information. So then the next question is, okay, well, does a computer-implemented version of that same set of steps all of a sudden make it patent eligible? And I think we've said many times that simply doing an otherwise ineligible process on a computer is not good enough. I think it depends on what the human... You gave an example of a smiley face. I don't think it's as simple, and I don't concede that anything that a human could put on there or anything that a human could read would put it within this abstract concept idea, because there's more to the claim, there's more to the process and the method. Can I ask, was there a claim construction of any of the terms, like the decoding, encoded, and so on? The only term... There was a claim construction hearing, and at the claim construction hearing, the judge made clear that certain terms were electronic. Well, certain are, for the end of the claim, are expressly electronic. That's not in dispute. I'm asking about the steps before that, right? Sending an email saying, here's the new address, that would be electronic. And the last, I guess, penultimate claim element says electronically transferring the sender information, and there's one about on a network. What about the coding, decoding? Did that have a claim construction, or was one requested? The judge stated in the claim construction order that decoding was an electronic. It was decoding was electronic. That is stated in the claim construction order, which is part of the record in this case. And so we have, it's at Appendix 1948, where the court states that the terms, electronic terms, decoding and electronically transmitted are used. So I think the one that really matters here that wasn't really addressed by the court of claims, in fact, the court of claims did something different. The court of claims talked about how a human could decode, and it was actually inconsistent with the words used in the claim construction, which is that decoding is an electronic term. And electronic term, and now particularly with respect to the issues raised by the second step, if decoding, as we believe, is an electronic term, humans aren't capable of decoding the types of information that are involved with... So you're saying that eligibility is determined if you have an electronic term, even though you didn't invent decoding, but because it's electronic, a human can't perform it, and therefore it's eligible under 101? Is that your argument? No, Your Honor. On step two, where we get into the arguments with respect, and the factual analysis with respect to, was to a person of ordinary skill in the return mail field, back at the time of the application, was it well understood, conventional, or routine to do the steps, including decoding, which are set forth in the claims? And we believe that was a factual analysis. Obviously, experts on both sides, we had an esteemed expert, tenured professor, more than 30 years' experience, who explained in detail in his declaration why those steps of the claim 42 and 44 were not, at the time, well known, understood, and routine. You're into your rebuttal, so let me hear from the other side. Yes, Your Honor. Thank you. Thank you, Your Honor. May it please the Court. What Return Mail, Inc., RMI is asking you to do is to put aside this Court's precedence and ambitions in the specification, intrinsic evidence, and focus on what their expert says, extrinsic evidence. Now, to the specific points that my colleague mentioned, first of all, the first issue about whether decoding, irregardless of whether decoding is done by a person or a computer, the notion of decoding data that represents what the person, what the sender, what the subscriber chose, what they chose, is not an inventive step. It cannot be an inventive step. There are two relevant cases that stand for that proposition. Just at the threshold which you just adverted to, do you have a view about whether the encoding decoding language in Claim 42 does, is restricted to some sort of electronic process? It is not. And I will point the Court to the appendix 19, the claim construction. I'm sorry, what? The appendix 1933. 1933, okay. 1948 is actually about different claims, but something. It is, correct. And it was in the context of a different claim, Claim 39, that the Court said the return mail service provider of Claim 39 is an electronic term because it does things such as the electronic. In 1933, the decoded data is just information converted into usable form. Actually, those are the two competing constructions that the parties put forward. So neither party specifically sought a construction seeking an electronic decoding. And the specific site in the record is, I believe 1951 to 1953, is where the Court analyzes the decoding term as it appears in Claim 42. And there it concludes on 1943, simply construing decoding to be deciphering information into a usable form. That would include the example of the understanding of the smiley face. It means I want this or I don't want this. Now, just based on this Court's precedence, we would submit that Recogny Corp. and secured mail stand for the proposition that encoding a user request, whether it is I want updated information or something else, is a generic conventional use of the abstract idea of encoding and decoding. Recogny Corp. refers to ordering by a numbering system at a fast food restaurant. In secured mail, there was a case that issued after this Court's prior return mail case. There, one of the sets of patents included in a fixed marking that related to the sender, the receiver, and the shipping method. The shipping method is akin to a service type, whether you want a return receipt, a delivery confirmation, or an updated address. So, just based on these Courts' precedence, that cannot give birth to an inventive concept. Your friend, as I think you point out in your brief, they use the term ordered combination 25 times in their brief. What do you understand them to mean by ordered combination? So, we agree that in Step 2, you look at the limitations individually and you look at them as an ordered combination. Now, they've never specifically cited, this is a method claim. In method claims, we do not presume any specific ordering unless there's a claim construction that states as much, or that there's something inherent in the claim, there's some logical or grammatical reason to think so. One of the points that they make on their Step 2 analysis is the idea of decoding after an attempted, a failure to deliver. What the parties are referring to as 42C must happen after 42B. We do not read the claim to be that narrow. So, we do not read... Well, assume it was. I mean, assume there was some sequence. Sure, even if the claim was to be read in the order in which it is written, where the steps 42A through 42G happen serially, that is a conventional routine ordering. We can look at it. First of all, 42A is similar to the first step in secured mail where you're having a mail piece with a destination address and it encoded data on it. Then, the next step is something that's always happened as long as the Postal Service has delivered mail, there's been undeliverable mail. 42C, the step of decoding that data after you recognize that there is undeliverable mail is a simple... is the natural thing to do. You're not going to want it... You don't need to determine what the user's request is for undeliverable mail if the mail has been delivered properly. So, there's no need to do 42C before 42B. It's more natural. You are picking the subset of... You're analyzing, you're decoding the relevant subset. Well, that sounds more like an obviousness argument, like it would have been obvious to do this in this sort of sequence. In addition to being obvious, we also think it's conventional and routine to identify the relevant subset. That's what 42C is doing after the placement of 42C, after the placement of 42B. That's what's happening there. Then, steps of 42D and E are the processing of that, which are akin to the authenticating that happened in secured mail. Once you get the mail piece in secured mail, we allow you to authenticate it by comparing the barcode with what you had stored previously and match it here. You're decoding the user's request and determining what the person wanted. And then the last two steps are just conventional post-processing steps that you're fulfilling the user's request. I suppose if all of these steps really amount to an abstract idea, and any aspect that's being computerized is just the mere invocation of a generic computer to perform that abstract sub-step, then it doesn't really matter whether any given step or any sequence of any of these steps is quote-unquote conventional, well-understood routine. That's correct. And the step two analysis, when you're looking at whether something is routine, conventional, and well-known, you don't necessarily look at... This is to echo what you're saying. You don't necessarily look at whether a computer doing that was routine, conventional, and well-known if there was a human analog to it. And that there certainly was. The specification explains how in the past people would receive return mail, then they would search, they would try to determine what the reason is for it, that it failed delivery. They would look at databases, and then they would use that. Now what they added here is an encoded data on top of that. That is simply used to make the computer can have that data where it can be in claim 42, it's what does the user want in claim 44. It's also what is the destination address. By storing what is the original destination address or what is the intended destination address in an encoded way where you can quickly capture that and you can use it for further processing quickly. That's what the patent discusses, but that is simply using computers which always operate on encoded data. And it's using that in that normal sense. If there are no further questions, I'll cede the balance of my time. Your Honor, with respect to the issue of the meaning of decoding, while it's true in the claim construction that was with respect to a different set of claims, no one specifically asked for claim 42 or 44 what the term decoding meant. The judge in his claim construction order says that decoding and transmitting are electronic terms, and I don't think that's true. I do think that there's a sound argument that once the court concludes that these are electronic terms, that they should be any differently determined or construed with respect to other claims that use the same word. So I do think the court made clear that this was electronic, and I do think the court ignored that when the court looked at the intrinsic record to determine whether or not summary judgment was appropriate. With respect to the ordered combination of claims here, it is impossible to read claim 42, as an example, and not perform the steps in order. I mean, it's inherent, because obviously unless you encode first, and the encoding is on the mail piece, you can't decode. And once you decode, and the claims require this, then the decoded data creates output data. So it has to happen in that sequence. You have to have encoded mail. You have to have it identified as undeliverable, because that's what this entire invention, and that's the only thing this entire invention addresses. And then it's decoded and creates output data. So the combination here is the invention. And I don't think, while it's true that there was no request in claim construction, that the court deemed this an ordered combination, it's inherent in the elements, the six elements of the claim itself, that they can't really be done in any other way. And therefore, and this is, I think, the heart of my argument, and that is when you look at the elements of this claim 42 and 44, those elements are what was not previously known, conventional, performed in the return mail industry. A person at the time, and we're talking about 1997, was the date of the prior process, prior to this filing of the patent application. It had never been done. In one sentence, can you just articulate the inventive concept here? Yes, Your Honor. The inventive concept was finding a solution to return mail information from just a subset of all of the mail that is sent out for delivery. And these elements tell you how to do that, and they give you a process, a method for how to do that. Previously, all the mail had to be researched, millions upon millions of pieces at a great expense. Just looking for one sentence on what it is. Well, yes. In any event, to me, that is what the inventive concept is. And I think the problem here was, by taking it away from return mail on summary judgment, we never had an opportunity for a trial where the experts would testify live, where the witnesses would appear live, where they would be subject to cross-examination, where we would have the best evidence with respect to what was done previously, whether or not this was a specific improvement to what had been done previously, to the abstract concept. And then moving to step two, all of the things which make up these elements, which we believe each one of them, yes, did encoding exist in the abstract? Of course it did. Did decoding exist in the abstract? Of course. But it never existed together in combination, in sequence, in the return mail industry. And this has been a giant cost savings for the United Postal Service, for the U.S. Postal Service. It went from over $1.50 or so per piece of mail to determine what to do with undelivered mail, down to a fraction of a penny. That's the invention. That's the inventive concept. Time is up. Thank you.